NEW JERSEY ZINC COMPANY, complainant-respondent,

*v.*

SAYER FANCHER et al., defendants-appellants.

[Argued January 22d, 1925.  Decided March 16th, 1925.]

1. Finding of fact by the court of chancery as to the location of "high-water mark" in Wawayanda lake, as established in deeds by John Rutherford and Thomas Iron Company in 1871, *held*, supported by the evidence.

2. The nineteenth course in deed of Thomas Iron Company to Rutherford, in 1871, *held.* controlled by definite monument at its termination regardless of possible shortage in area of land conveyed, resulting therefrom.

3. In a bill to enjoin repeated acts of trespass on waters of a lake and its shore, the dispute centered about a claim by defendants to frontage on a section of the northeasterly shore of the lake, which claim was expressly disallowed by the court, as to the rest of the lake and its shores, complainant's title was undisputed. *Held*, that the bill was broad enough to cover the whole lake and its shores, and that an injunction against repeated trespasses on any part of said premises was proper.

On appeal from a decree advised by Vice-Chancellor Backes, whose opinion is reported in *2 N. J. Adv. R. 1201; 96 N. J. Eq. 65.*

*Mr. Robert H. McCarter,* for the appellants.

*Mr. Corwin Howell* (*Mr. Alfred F. Skinner* and *Mr. William A. Dolan,* on the brief), for the respondent.

The opinion of the court was delivered by

PARKER, J.

The bill of complaint alleges repeated and persistent acts of trespass on premises to which, or to part of which, the title of complainant's predecessors was declared to be good as against defendants or those under whom they claim (*Graves* v. *Fancher, 81 N. J. Eq. 407, 517*), and prays injunction against such trespasses to avoid multiplicity of suits. The learned vice-chancellor held, as will be seen by a reading of his opinion, that by the decree in the former suit the matters now litigated between the parties are *res judicata* both as to title and location of the premises claimed. Incidentally, he made one or two other rulings which are brought up with the main controversy, and will be considered in due course.

The first fundamental issue of the controversy relates to the location of "high water mark" so called in the reciprocal conveyances between John Rutherfurd, predecessor in title of

the defendants, and the Thomas Iron Company, predecessor
in title of the complainants, in 1871. At that time Ruther-
furd owned a farm called the Banta farm, which bordered
on the northeasterly end of Wawayanda lake, in the county
of Sussex (previously called Double Pond, perhaps, because
it had been cut by an old dam now some feet under water).
The iron company then owned or controlled all the other
lands around the lake, especially at its northerly end, includ-
ing a dam at the extreme northeast corner east of the Ruther-
furd property, the spillway of which supplies a brook called
Double Kill, running eastwardly and connecting with Burnt
House Brook, mentioned in the descriptions of the deeds.
Burnt House Brook runs irregularly toward the north and
forms part of the easterly boundary of the thirty-nine-acre
tract presently to be mentioned. The iron company wished
to raise the dam, and this, naturally, would overflow the
Rutherfurd land. From the deeds, and surveyor's notes and
other evidence it is entirely plain that Rutherfurd was to get,
and did get, in place of overflowed land then owned by him,
upland to take its place, *i. e.,* the "thirty-nine-acre tract"
just mentioned, and which adjoins the Banta farm on the
east. And the second fundamental issue of the controversy
is whether the southeast line of the thirty-nine-acre tract
joins the southeast line of the Banta farm above or below
"high water mark" as agreed upon at the time or as existing
at this time, or does not join the southeast line of the Banta
farm at all. Appellants go so far as to claim that there is
even a *considerable* gap between the ends of the *two* lines,
which must be closed by the forcible interpolation of a course
of from say fifty to one hundred and fifty feet below high
water mark in the lake. These two southeasterly lines are
nearly parallel. That of the Banta farm ran in 1871 south,
fifty-one degrees twelve minutes west; that of the thirty-nine-
acre tract ran south, fifty-eight and one-half minutes west.
Hence, they were bound to meet somewhere if produced far
enough. Complainants say they met above high water mark
and so cut defendants off from any water front on the thirty-
nine-acre tract. Defendants say they met, if at all, below

high water mark, and this gave them some access to the shore, more or less. The vice-chancellor held with the complainants, and, as we conclude, correctly. But where he said the decree in *Graves* v. *Fancher* made the matter of location *res judicata,* this must be read with the assumption that the description in the bill and in the decree in that case points to monuments and landmarks that can be identified on the spot, and describes the premises in such manner that from such description, to use the language of the Ejectment act, possession may be delivered. So, that when the description in *Graves* v. *Fancher* speaks of high water mark as a "straight line cut into a certain rock, above which line are cut the letters H. W.," and such marks are in plain view and well authenticated, the case is simple; but if they should be obliterated, it will be necessary to fix their location as in the case of any other lost monument. There was much contradictory evidence on this point in the present case.

It has already been stated that the situation giving rise to the present controversy was created in 1871, when the iron company wished to raise the dam. In this aspect of the case the most illuminating piece of evidence is the original field notes of Benjamin Roome, an old-fashioned country surveyor of long experience and general familiarity with the land titles of this section of the state. Obviously, he was employed to locate the east and southeast lines of the Banta farm owned by Rutherfurd, and to tack to it the thirty-nine acres which the company was to convey. His own language will show what he did infinitely better than any paraphrase or description by another:

"1871, July 14. Went from John Rutherfurd's, Vernon, to George Hunts, Double Pond, to run the Banta Farm, owned by Rutherfurd, 118 84-100 acres S. 7-55 and 6½ acres, and 2 acres.

"As the beginning corner could not be found to a certainty, run several random lines and found a large peperidge tree, marked O at the northeast corner of the meadow, supposed to be the 3d corner of said tract, and run from said tree by reversing the 2d course S. 80 W. 2 deg. 12 min. Va. 8 chs. to an old stone heap.

"Then 1st course reversing S. 15 W. 2 deg. 12 min. Va. 21 chs. to the beginning corner, and proved to be the right beginning corner as per description in deed or return—a stake and large stone heap,

east side of a ledge west of garden fence in front of the dwelling-house on the premises now occupied by Isaac Howard.

"Then run from peperidge 3d corner.

"3. S. 3 5.20 E. 2 deg. 12 Va. 20.90 to stake and stone.

"4. S. 49 W. 2 deg. 13 min. Va. 39 chs. to stake and stones.

"South of road from Double Pond to Rutherfurd Paddock Farm at high water mark of said pond.

"Then run the following lot to be conveyed

"By the Thomas Iron Co.

        to

"John Rutherfurd.

"Beginning at an iron post, marked B. E. G., standing on the west side of the road leading from the Double Pond to the burnt house, and distant 2 chs. 60 lks. S., 35 deg. 8 min. E. from a peperidge tree, the 3d corner of 118 84-100 acres Perth Amboy Book 8-7.55, known as the Banta Farm, then as run in 1871.

"1. Along said road N. 47 deg. E. 1 ch. 33 links.

"2. Along said road N. 14 deg. E. 2 ch. 31 links.

"3. Along said road N. 23½ deg. E. 3 min. 88 links.

"4. Along said road N. 44¼ deg. E. 3 min. 86 links, to the south-westerly corner post of the bridge over the Burnt House brook along said brook." (Then comes courses 5 to 18, inclusive, generally south.)

"19. S. 58½ W. 42 chains to a stake and stones at the edge of the Double Pond at high water mark on the 4th line of said 118 84-100 acre tract.

"20. Along the lines of said farm, N. 51.12 E. 10.70.

"21. N. 61.12 E. 14.60.

"22. N. 23.48 W 2.60.

"23. N. 51.12 E. 15.60.

"24. N. 33.08 W. 18.30 to the beginning. Continuing 39 acres strict measure."

Courses twenty-one and twenty-two run around a small gore added to the original Banta farm survey. Omitting this gore, course twenty would be north, fifty-one degrees twelve minutes east (or allowing two degrees twelve minutes variation, north, forty-nine degrees east), thirty-nine chains to the east corner of the Banta farm tract. That course is the exact reverse of the fourth course of the one hundred and eighteen and eighty-four hundredths acre tract. That fourth course ends at "stake and stones south of road from Double Pond to Rutherfurd Paddock farm at high water mark of said pond." The nineteenth course of the thirty-nine-acre tract ends at "stake and stones at the edge of the Double Pond at high water mark *on the fourth line of the said one hundred and eighteen and eighty-four hundredths acre tract.*" In short,

by the Roome field book, the "stake and stones" and monument on the fourth line of the one hundred and eighteen eighty-four one-hundredths of the Banta farm tract are absolutely indentified with the "stake and stones" monument at the end of the nineteenth course of the thirty-nine-acre tract, and the subsequent twentieth course of the thirty-nine-acre tract is identical with the Banta fourth course reversed. It is idle to claim that the nineteenth course did not join with the old fourth course; the language is too plain to yield to any considerations of short acreage or the like. Not only did they join, but they joined at a monument at high water mark and not below it. This was in July, about three months after the deed of Rutherfurd to the iron company was dated and acknowledged (April 22d, 1871), but three months before it was recorded. In that deed high water is fixed by the line and letters H. W. on the rock beyond the dam, an eighth of a mile or more away. The description is identical with that in the decree in *Graves* v. *Fancher,* except that the decree omits reference to flowage contained in the deed by Rutherfurd. The Roome survey does not mention this mark on the rock, nor does the deed from the company to Rutherfurd, which follows Roome's description of the thirty-nine-acre tract, substituting for his "stake and stones" an "iron post marked with the letters H. W. standing at the north side of the lake at high water mark in the fourth course," &c., but the two deeds and the survey are so nearly contemporaneous as to compel the conclusion that the parties to the two deeds and the surveyor that settled their boundaries for them were speaking of the same high water mark, whether indicated by a mark on the rock, or by the stake and stones across an arm of the lake from that rock, or by the iron post with letters H. W. substituted for the stake and stones in the deed from the company to Rutherfurd in October. It would have been an absurdity for the company to acquire from Rutherfurd rights running up to the mark on the rock, and then turn around and convey to him a thirty-nine-acre tract that would run below the level

of that mark and thus be subjected to the very flowage that they had just acquired by his deed. To our minds there is only one rational conclusion from all the evidence: that Roome's "stake and stones," the iron post substituted for it, and the mark on the rock, were all at substantially the same level and supplemented each other.

Where, then, were these monuments? Are they, or is any of them, now in existence and capable of identification? The stake and stones are gone; they had probably been removed just after Roome's survey. There is an iron post marked H.

"NOTE.—The accompanying sketch was prepared by the writer of the opinion to illustrate the general topography and the lines described in the Roome field notes."

W., but appellants claim it is far out of place. We need not stop to discuss this claim if the mark on the rock can be definitely placed. It was, apparently, there in 1911, when *Graves* v. *Fancher* was pending. Mr. Konkle, an old Sussex county surveyor, who testified in *Graves* v. *Fancher,* and for the present complainant, saw it at that time. It was a faint mark even then. He also saw the iron pin marked H. W. and observed the natural marking of the water on the rocks. They corresponded quite closely. He also located the iron pin in 1923 and again found the mark on the rock, almost obliterated, but still discernible. Defendants presented expert testimony of much weight tending to show that if such a mark had been cut in 1871 at the place indicated, the character of the rock was such that it could not have been eroded away to such an extent as to be undecipherable by the expert who first saw it in 1923. But we see no reason to doubt the direct testimony of Mr. Konkle, who was a witness in the former litigation. We concur in the findings of fact on this point by the learned vice-chancellor, without regard to the matter of estoppel suggested by him. The level of this mark on the rock has recently been re-marked by drilling of a hole in the face of the rock and the insertion therein of a brass pin which is tied up to other marks, and is used as a monument in the decree under review. This settles the level of high water mark correctly for the purposes of this case. Based on that level, the defendants are barred of access to the lake from the Banta farm at that level or below it, for they are estopped by the Rutherfurd deed to the iron company, and they are similarly deprived of access via the thirty-nine-acre tract, because that tract is entirely above high water line as established by the decree.

These considerations lead generally to an affirmance of the decree under review. It is urged for appellant that the decree is too broad in enjoining trespasses by defendants on any part of the lake, because the decree in *Graves* v. *Fancher* covered no more than had been conveyed by the Rutherfurd deed in 1871, and this conveyed only part of the Banta farm. Conceding this for present purposes without deciding it, an

examination of the record makes it clear that complainants not only asserted title to the whole of the lake in their present bill, but proved it by legal evidence, and, indeed, it was not disputed. It was also alleged and shown that the continued trespasses affected the whole lake. Whether the former decree related to all the lake or only part of it is not controlling on this appeal. The meritorious question actually litigated was whether defendants had any rights on the lake, and complainant proved and the court decided they had not. The description in the bill and decree, although taken from the Rutherfurd deed, is broad enough when considered apart therefrom to cover all of the lake. This litigation should have an end, and we are not disposed to stand on technicalities in this regard.

Finally, it is claimed that the injunction goes against some defendants who have not committed any trespass, and should not have been made parties at all. We concur in the views of the court below on this point.

The decree will be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, BLACK, KATZENBACH, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 13.

*For reversal*—None.